IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

------------------------------------------------------- :
DAVID LEE NALL, et al.,                                  : CASE NO.  1:10 CV 02883
                                                         :
                            Plaintiffs,                  :
                                                         : MEMORANDUM OF OPINION AND
                 -vs-                                    : ORDER GRANTING IN PART AND
                                                         : DENYING IN PART PLAINTIFFS'
                                                         : MOTION IN LIMINE (DOC. 31)
CITY OF PAINESVILLE, et al.,                             :
                                                         :
                            Defendants.                  :
------------------------------------------------------- 

UNITED STATES DISTRICT JUDGE LESLEY WELLS

Plaintiffs David Lee Nall, through his next friend Elizabeth Goodwin, and Rebecca Carlucci, bring this excessive force case, pursuant to 42 U.S.C. § 1983, against the City of Painesville and five named police officers in their individual and official capacities.  (Doc. 1).  Plaintiffs allege harm as the result of the use of a Conductive Energy Device ("CED"), in this instance a Taser.  Defendants have offered Samuel D. Faulkner, the Chief of Police of the Village of Mechanicsburg, as an expert witness qualified to offer an expert opinion on police procedures, training, and use of tasers as it relates to police training.  (Doc. 31, Exh. 2 Samuel Faulkner Expert Report).

Pursuant to Mr. Faulkner's deposition and represented background, the Plaintiffs seek the exclusion of Mr. Faulkner's expert report.  (Doc. 31).  Plaintiffs maintain Mr. Faulkner is not qualified to offer an expert opinion on the medical aspects of the matter, including "representations about the effects of tasers on the human body based on

probe location and duration, effects on the heart and respiration, the validity of scientific studies on tasers, the effects of other risk factors on tased individuals, the propriety of Taser International's altering its preferred target area, and the ability of an individual to resist while being tased." (Doc. 31, p. 1).  Defendants maintain that Mr. Faulkner should be allowed to include these medical reports as permissible augmentation under Fed. R. Evid. 703.  (Doc. 37).  For the reasons discussed below, the Plaintiffs' motion to exclude will be granted in part and denied in part.

**Law and Analysis**

Rule 702 of the Federal Rules of Evidence permits testimony based on "scientific, technical, or other specialized knowledge" by experts qualified by "knowledge, skill, experience, training, or education" if the testimony is both relevant and reliable.  See Fed. R. Evid. 702.  The trial judge must act as a gatekeeper, admitting only that expert testimony which is relevant and reliable.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).  As a gatekeeper, the trial judge has discretion in determining whether a proposed expert's testimony is admissible based on whether the testimony is both relevant and reliable.  Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 429 (6th Cir. 2007); see Daubert, 509 U.S. at 589, 113 S.Ct. 2786 ("[U]nder the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.")  "In short, under Daubert and its progeny, a party proffering expert testimony must show by a preponderance of proof that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and

2

disposing of relevant issues." Sigler v. Am. Honda Motor Co., 532 F.3d 469, 478 (6th Cir. 2008) (citing Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000))

Daubert attempts to strike a balance between liberal admissibility for relevant evidence and the need to exclude misleading "junk science." Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171, 176-77 (6th Cir. 2009). An expert must utilize in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 177.

The relevancy requirement stems from Rule 702's mandate that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." Id. at 591, 113 S.Ct. 2786; U.S. v. Bonds, 12 F.3d 540, 555 (6th Cir. 1993). Relevance means that "there must be a 'fit' between the inquiry in the case and the testimony." Bonds, 12 F.3d at 555 (citing Daubert, 509 U.S. at 591, 113 S.Ct. 2786.) The reliability requirement is drawn from Rule 702's requirement that the subject of an expert's testimony be "scientific ... knowledge." Daubert, 509 U.S. at 589–90, 113 S.Ct. 2786; Bonds, 12 F.3d at 555. In this context, reliability means "evidentiary reliability" or "trustworthiness" which in turn connotes "scientific validity." Bonds, 12 F.3d at 555. A party proffering expert testimony has the burden of demonstrating by a " 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." Pride v. BIC Corporation, 218 F.3d 566, 578 (6th Cir.2000). The trial court's focus should be on principles and methodology, not on conclusions that they generate. Daubert, 509 U.S. at 595, 113 S.Ct. 2786.

The Sixth Circuit has explored the standards that the district courts should use in

evaluating whether so-called "police practices" experts should be allowed to testify at trial.  See Berry v. City of Detroit, 25 F.3d 1342 (6th Cir.1994).  In Champion v Outlook Nashville, Inc., 380 F.3d 893, 907-08 (6th Cir. 2004), in discussing experts who opine on police practices and procedures, the Sixth Circuit clarified Berry, noting that, if the proffered expert had "specialized knowledge" and "specific expertise about police activities" with "experience on the subject of criminology or police actions" such that the proffered expert could opine on "discrete aspect[s] of police practices [such as] excessive force, based on particularized knowledge about the area," then the testimony would likely be permissible, particularly if it was supported by strong experiential or educational credentials.  Id.  In sum, the court stated that "the proper actions of individual officers in one discrete situation" is an appropriate field for expert testimony, so long as the expert has sufficient credentials and the testimony will assist the trier of fact.  Id.  When expert testimony is primarily based on the experience that the proffered expert has gained through personal endeavors, the expert "must explain how that experience leads to the conclusion reached ... and how that experience is reliably applied to the facts."  Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir.2005).

With regard to scientific knowledge, the trial court initially must determine whether the reasoning or methodology used is scientifically valid and is applied properly to the facts at issue in the trial.  Daubert at 589.  To aid the Court in this gatekeeping role, the Supreme Court has identified several key considerations, including whether the expert opinion can be tested; whether it has been subjected to peer review; the error rate of the methods that the expert employed; the existence and maintenance of standards used in the expert's methods; and whether the expert's methods are

generally accepted in the scientific community.  Id. at 592–94.  The objective of Daubert's gatekeeping requirement is to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).  The Court has broad discretion in determining whether the Daubert factors reasonably measure reliability in a given case. Id. at 153.

In this instance, Mr. Faulkner provides the background, relevance and reliability to establish that he is qualified to provide expert opinion testimony regarding police procedures and police training on tasers.  (Depo. 86).  As the Defendants note, Mr. Faulkner is the current "Chief of Police for the Village of Mechanicsburg, has been retained in more than 300 police-related cases to provide analysis and testify as an expert witness.  He has been qualified in State and Federal Courts in Defensive Tactics/Subject Control and in police and correctional procedures.  Further, he has been a Taser instructor for approximately ten years and has been a presenter at numerous seminars in Conductive Energy Devices (CEDs)."  (Doc. 37, p. 1).

Defendants present Mr. Faulkner as an expert in police procedure and police training on tasers, essentially an expertise predicated on experience.  Yet, in his report Mr. Faulkner injects extensive quotes on the medical and scientific aspects and effects of tasers from outside reports supplied by both Taser International, the manufacturer of the CED used in this instance, and the National Institute of Justice.  Such an expertise requires scientific knowledge.

To a limited extent, relying upon knowledge of the same ken is permissible.  Rule

703 of the Federal Rules of Evidence specifically allows experts, in reaching their opinions, to rely on "facts outside the record and not personally observed, but of the kind that experts in his or her field reasonably rely on in forming opinions."  Under Rule 703, an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts.  Barris v. Bob's Drag Chutes & Safety Equipment, Inc., 685 F.2d 94, 102 n. 10 (3rd Cir.1982).  The rule states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Fed. R. Evid. 703.

In this instance, inclusion of the following medical and technical opinion material, excerpted here, from Mr. Faulkner's Report is in dispute[1]:

> (1)  If both of the probes are in or in close proximity to the chest area, there is less chance of achieving the muscular lockup that Tasers are known for.  Another reason is that no matter what substances are in the subject's body, no matter how poor his/her physical and/or medical condition, if the probes are anywhere near the chest, there is an increased chance that the Taser will receive at least some of the blame if the subject does die.  The exact wording in Taser Bulletin 15 states, "By simply lowering the preferred target zone by a few inches to lower center mass the goal of achieving Neuro Muscular Incapacitation (MNI) can be achieved more effectively while also improving risk management." (Report, 14).
>
> (2)  It is my opinion that . . . the Taser is the best tactical response which offers a high propensity of establishing control while offering a low propensity of causing injury for both the officers and the subject being

---

[1] Quotation marks in the excerpted material are in Mr. Faulkner's Report and indicate verbatim information from an outside report upon which Mr. Faulkner is relying.

6

arrested. . . . a release from Taser International, Inc. . . . states . . . "5.4% of the 1.4 million filed incidents of Taser deployments equates to the number of people saved from serious injury or death."  (Report, 16).

(3)  I am also including a May, 2011 study from the U.S. Department of Justice, National Institute of Justice, titled, Police Use of Force, Tasers and Other Less-Lethal Weapons. . . . "The study's most significant finding is that, while results were not uniform across all agencies, the use of pepper spray and CEDs can significantly reduce injuries to suspects and the use of CEDs can decrease injuries to officers." (18).

(4)  One factor looked at in this study was if research indicated that the use of CEDs could result in ventricular fibrillation. . . . "Several studies showed that standard shocks that lasted five to 15 seconds did not induce ventricular fibrillation of the heart.  Higher discharges, 15 to 20 times the standard, or those of longer duration – two 40-second exposures – induced fibrillation or increased heart rhythm in some pigs.  In addition, longer exposures led to ventricular fibrillation-induced death in three pigs." (18).

(5)  The study went on the say, "Controlled studies involving healthy human subjects (often law enforcement trainees) found that subjects experienced significant increases in heart rates following exposure, but none experienced ventricular fibrillation."  Caution was advised when dealing with "small children, those with diseased hearts, the elderly, those who are pregnant and other at-risk people." (18).

(6)  Advice from the study stated, "A suspect's underlying medical conditions may be responsible for behavior that leads law enforcement officers to subdue him or her.  Sometimes this includes CED use.  Abnormal mental states in a combative or resistive subject, sometimes called "excited delirium" may be associated with a risk of sudden death.  This should be treated as a medical emergency."  (19).

(7)  "People rarely die after being pepper sprayed or shocked with a Taser . . . Although both cause pain, they reduce injuries and according to current medical research, death or serious harm associated with their use is rare." (19).

(8)  Some of the materials that have been presented on behalf of the Plaintiff that cite some negative effects by the Taser are actually studies that were done on pigs.  None of the studies on human subjects have reproduced any of those negative effects.  (19).

(9)  A major factor this NIJ study found was, "the risk of death in a

CED-related use-of-force incident is less that[sic] 0.25 percent, and it is reasonable to conclude that CEDs do not cause or contribute to death in the large majority of those cases." (19).

(10) "There is no conclusive medical evidence — that indicates a high risk of serious injury or death from the direct or indirect cardiovascular or metabolic effects of short term CED exposure in healthy, normal, nonstressed, nonintoxicated persons." . . . The study goes on to state, "There is currently no medical evidence that CEDs pose a significant risk for induced cardiac dysrhythmia in humans when deployed reasonably." (20)

(11) The study states, "There is a multitude of ECG and cardiac enzyme data in the literature supporting no significant long-term effects on the heart by CED use. Autopsies have not demonstrated evidence of myocardial infarction (heart attack)" The available data do not show long-term blood chemistry changes affecting cardiac function. There are some recent data demonstrating significant increase in blood acidity (acidosis) in animal models after CED use. Some research has examined the role of exertion in combination with CED effects. Extreme physical exertion causes an increase in acidosis because of the production of lactate in the muscles. Severe acidosis can cause spontaneous dysrhythmias that would not be a direct effect of CED use. Additionally, severe acidosis can lead to pulseless electrical activity which may be a mechanism of sudden death seen after a prolonged struggle. CED exposure does not appear to worsen the acidosis that is present from exertion alone." (20).

(12) The sudden deaths of subjects in custody are not just CED problems. The NIJ study states, "Although sudden death occurs in custody with and without the use of CED, the exact mechanism of death in many cases is often not clear. . . . In some cases, the individual may not be experiencing a medical emergency related to acidosis, respiratory compromise, or cardiac arrhythmia." (20).

(13) The study found, "The panel does recognize that CED use involving the area of the chest in front of the heart is not totally risk-free; current research does not support a substantially increased risk of cardiac dysrhythmia in field situations from anterior chest CED dart penetration." (21)

(14) It has been alleged that the Taser made it so Mr. Nall was not able to breathe. This study does not support that allegation. "The balance of acid and base in the body is maintained by the respiratory system and the kidneys. These respond to the metabolic demands of the individual. As with rigorous exercise, the CED causes muscle contractions that

8

produce lactate in the blood.  Lactate lowers the pH of the blood, making it more acidic.  Research to date, however, shows that human subjects seem to maintain the ability to breathe during exposure to CED.  In fact most evidence suggests hyperventilation with an increase in respiratory rate, tidal volume, and minute ventilation during CED exposure.  Direct observation of diaphragmatic movement was seen in one study." (21)

(15)  It has been proposed that acute stress can damage the heart. . . . "Medical research suggests that CED deployment during restraint or subdual is not a contributor to stress of a magnitude that separates it from the other stress-inducing components of restraint or subdual."  (21).

(16)  There is not a great deal of research on prolonged Taser cycles but this study does state, "Although studies on human volunteers undergoing prolonged (greater than 15 second) CED exposure showed statistically significant changes in blood gases, these changes (or any respiratory impairment) appear to have limited clinical significance in these healthy individuals."  (21)

(17)  "There is no evidence in animals that indicates a high risk of injury from a single discharge lasting less than 15 seconds from a Taser X26. . . . Thirty-second exposure to the output of the Taser C2 CED in swine resulted is [sic] significant changes in blood chemistry, although most of the blood changes returned to baseline after the CED discharge ended.  However, in one study, 20-to-30-second C2 CED application in healthy humans had no significant deleterious effects on their physiology." (21-22)

(18)  There is no standard definition of "prolonged" CED exposure for either continuous duration or number of multiple interrupted discharges.  Review of deaths following CED exposure indicates that some are associated with prolonged or multiple discharges of the CED.  By contrast, experiments using healthy human volunteers have found no cardiac dysrhythmias or respiratory dysfunctions following exposures less than 45 seconds.  There are no published studies of humans exposed in excess of 45 seconds.  Continuous 15 second applications of the X26 to either the back of the chest of "physically exhausted" adult humans (designed to mimic field situations), over a 12-inch anatomic spread encompassing the heart, yield normal electrocardiograms.  (22).

(19)  "Most fatalities involving CED use are in people who have other risk factors for sudden death. . . . The conclusion of the study states, "In general, the outcome data are consistent with medical research and this panel's review of deaths following CED deployment.  Deployment of CED has a margin of safety as great or greater than most alternative."  (22).

  (20) The research on the Taser indicates that it is a safe control option and not a risk of respiratory and/or heart problems to normal humans. (23)

The Court's review of Mr. Faulkner's Report and of this excerpted material leads it to conclude that the medical and technical conclusions reached by Mr. Faulkner are outside the ambit of the permissible use of such material under Rule 703, in light of the fact that Mr. Faulkner is being presented as an expert in police procedures and not as an expert in the medical and technical effects of Tasers. The Report's use of these verbatim study conclusions serves not to augment Mr. Faulkner's admitted area of expertise on police procedures but, instead, conveys medical conclusions regarding the physical effects of taser use outside of his purported, experientially based, expertise.

To limit Mr. Faulkner's report to his acknowledged, qualified, expertise in police procedure and training does not thwart the goals and purposes of the Federal Rules, see Laski v. Bellwood, 132 F.3d 33 (Table) (6th Cir. 1997) *2-3. This is not a matter of limiting Mr. Faulkner's testimony to police procedure because he is not the best qualified or because he does not have the specialization that the court considers most appropriate. Instead, Mr. Faulkner himself acknowledges that, with regard to the medical aspects of his report, he brings no expert conditions to augment any proposed testimony in aid of a jury's understanding.

Regarding his expertise involving the medical opinions in his report, Mr. Faulkner testified as follows during deposition:

  Q: And your report has many pages of paragraphs where you're quoting the National Institute of Justice medical opinions, right?

  A: Yes, sir.

> Q: You're not a medical doctor, right?
>
> A: I am not, sir.
>
> Q: And you can't give any opinions to a reasonable degree of medical certainty, right?
>
> A: I can't. All I can do is say the review of the literature of what the professionals have said.
>
> Q: And that portion of your report where you're repeating the reports of others doesn't draw on any particular law enforcement expertise, right? That portion of your report has no more weight than any other citizen who reads those reports, right?
>
> MR. Reid: You mean the National Institute of Justice?
>
> Q: No. I'm talking about your repeating that. Do you have some sort of unique medical knowledge that makes that part of your professional opinion in this case?
>
> A: No, just applying that to what I've learned as a taser user and taser instructor.
>
> Q: Is it part of your professional opinion that your views on the risks of taser to the heart and to breathing carry more weight than any other person reading those reports?
>
> A: No, sir.

(Faulkner Depo. 88)

Mr. Faulkner, then, admits that he cannot offer relevant opinions on the medical aspects of CEDs based on scientific evidence that was beyond the ken of average jurors. While the medical and technical effects of CEDs is a determinative issue facing the jury, Mr. Faulkner's opinions on such matters cannot assist the trier of fact in its ultimate decision. Under such circumstances, the Court cannot allow the medical testimony of the Defendants' police procedure expert to be freighted into Mr. Faulkner's report. The excerpts from the report, enumerated above as paragraphs 1 through 20,

will be excluded.  The remainder of the report, consonant with Mr. Faulkner's expertise, will not be excluded.

Accordingly, the Plaintiffs' motion to exclude Mr. Faulkner's report in its entirety is granted so far as it pertains to the exclusion of the above enumerated paragraphs 1-20, and denied so far as the balance of the report.

IT IS SO ORDERED.

       /s/Lesley Wells
UNITED STATES DISTRICT JUDGE

Date: 11 May 2012